[Crim. No. 560. Fifth Dist. Apr. 8, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIE ROBINSON, Defendant and Appellant.

## COUNSEL

Lloyd L. Hicks, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edsel W. Haws, Thomas W. Kelly and A. Wells Petersen, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GARGANO, J.**—Appellant was convicted of assault with a deadly weapon, with intent to commit murder, in violation of section 217 of the Penal Code. He appeals from the judgment entered on the jury's verdict.

The facts, when viewed in the light most favorable to respondent, are these: On June 10, 1967, appellant was playing cards in Harry Player's Card Room when an argument broke out between appellant, Sam Richards and Lee Henderson. Richards was running the game, but Lee Henderson was not playing. Afterward, as Henderson was walking away from the card table, he was hit in the back by a bullet from a gun. Henderson turned around, lunged at appellant and was hit two more times. He was taken to the hospital by his brother-in-law, John Bell.

On the same day, Ivan Kennedy gave appellant a ride in his pickup truck. Appellant told Kennedy that he had shot a person. Kennedy took appellant back to the card room, and from there to the 11-11 Club. At the club appellant began to annoy a woman and was asked to leave by Pearl Hardy, the club operator. Appellant told Miss Hardy he "just had shot one nigger three times" and that he would shoot her and all of her "God dam men."

At the trial, Sam Richards testified that he was not involved in an argu- with appellant prior to the shooting, that the argument was between appellant and Henderson, and that appellant and Henderson were off by themselves when the shooting started. He said he did not see who fired the shots because he jumped behind a card table. On the other hand, Henderson testified that the argument was between appellant and Richards, and that he told appellant to leave the old man alone. He said that he was shot in the back after he turned to walk away from appellant's table, and was hit two more times as he lunged at appellant.

Appellant denied shooting Henderson or having a gun in his possession at the time of the shooting. He testified that he was having a discussion with Sam Richards about the way Richards was running the card game and that Henderson threatened him and made an obscene remark. He said he blacked out and did not remember anything else that happened except that he heard one shot. Appellant explained that during the previous year he had been struck in the head with a piece of iron while on a construction job, and as a result of this injury had experienced several serious blackouts.

Appellant's main argument for reversal centers on our Supreme Court's pronouncement that section 1235 of the Evidence Code is unconstitutional to the extent that it allows prior inconsistent statements of a

witness to be used as substantive evidence, because such use impinges upon a defendant's Sixth Amendment right of confrontation (*People* v. *Johnson,* 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111]). Specifically, appellant asserts that the trial court committed prejudicial error by admitting into evidence the prior inconsistent statements of the witness John Bell, without limiting the statements to impeachment. Bell testified for the prosecution. He said he heard the shots and saw Henderson grab appellant but denied seeing appellant shoot Henderson. He also denied seeing a gun in appellant's hand. The prosecutor then called Ed Bennett of the county sheriff's office. Bennett testified that Bell told him that appellant had a revolver in his hand and that he saw appellant shoot Henderson with it.

In rebuttal, respondent does not challenge appellant's right to raise the *Johnson* error in this appeal, even though appellant's trial counsel did not object to the impeachment testimony or request a limiting instruction or admonition; appellant's trial was concluded before the Supreme Court's opinion in *Johnson* was filed, and he is deemed not to have waived a substantial constitutional right by his counsel's failure to perform what appeared to be a fruitless or idle act (*People* v. *Vinson,* 268 Cal.App.2d 672, 675 [74 Cal.Rptr. 340]). Respondent insists that the instant case is distinguishable from *Johnson* because at the conclusion of the trial the trial judge gave the standard instruction which tells the jury that they can consider prior inconsistent statements of a witness in judging the witness' credibility; he did not, as in *Johnson,* tell the jury that they could consider Bell's inconsistent statement for all purposes. Respondent also argues that it must have been evident to the jury, from the colloquy between defendant's counsel and the prosecutor, that the prosecutor was offering Bell's statement for impeachment purposes only. According to the record, the following transpired: "MR. DALY: If the Court please, I am going to object to this question as an improper way of getting the prior inconsistent or consistent statement before the jury.

"MR. MCGILLIVRAY: He is an impeachment witness, your Honor, to impeach my last witness, which I believe I am permitted to do under the Evidence Code, and it comes in as an exception to the hearsay rule because it is impeachment.

"MR. DALY: I don't object to the testimony as long as it is limited to the question asked of Mr. Bell.

"THE COURT: Yes, you have to limit it to the same alleged statement, Mr. McGillivray.

"MR. MCGILLIVRAY: Okay."

An argument essentially similar to that made by respondent in this case

was rejected by the Supreme Court in *People* v. *Odom,* 71 Cal.2d 709, 715 [78 Cal.Rptr. 873, 456 P.2d 145], and we are bound by that decision.[1] We therefore turn to respondent's contention that the error does not require a reversal of the judgment. ■ But we shall keep in mind that because the error was of "federal constitutional dimensions," it is respondent's burden to prove that it was "harmless beyond a reasonable doubt." (*Chapman* v. *State of California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Johnson, supra,* 68 Cal.2d 646, 660.)

■ We believe that respondent has met this burden. Lee Henderson was shot while he was in Harry Player's Card Room, and there is not a scintilla of evidence even to suggest that someone other than appellant was the culprit. On the other hand, there is persuasive direct evidence that appellant was the one who did the shooting; Henderson testified that after he was hit in the back by the first bullet, he whirled, saw a gun in appellant's hand and heard two more shots as he lunged at appellant. Moreover, the direct evidence is corroborated by impressive circumstantial evidence. Henderson was shot almost immediately after he made an obscene and degrading remark which implied that he was going to force appellant to commit an act of perversion. Although John Bell denied seeing the gun in appellant's hand or seeing appellant shoot Henderson, he nevertheless said that he saw the two men struggling, heard shots and then saw his brother-in-law fall to the floor seriously wounded. On the same day, appellant told Ivan Kennedy that he had shot someone.[2] A short time later appellant told Pearl Hardy that he had just shot a Negro and he would shoot her and all her men too. It stretches the imagination to believe that the jury would have reached a different verdict if the trial judge had instructed them to consider Bell's prior contradictory statements for impeachment purposes only.

---

[1]See also *People* v. *Vinson,* 268 Cal.App.2d 672, 674 [74 Cal.Rptr. 340], footnote 1.

[2]Kennedy testified as follows:

"A. I would like to say what he said, but I can't say what he said. I would have to say what I thought he said. What I understood him to say he had shot somebody.

Q. You understood him to say that he had shot somebody?

A. Yes.

Q. Okay, and what did he say about it?

A. He didn't say anything.

Q. What did you say when he said that?

A. I just looked at him. I didn't pay very much attention. I thought he was just going on and I didn't pay any attention and in fact he may not have said that. He may have said something else, but I thought that is what he said.

Q. But you thought he said that?

A. Yes."

Appellant's second contention for reversal is that the court erroneously allowed the prosecutor to impeach Ivan Kennedy with inadmissible prior inconsistent statements under the guise that he was trying to refresh the witness' recollection. Kennedy had testified for the prosecution on several other matters and was asked to recount what happened in the 11-11 Club. Kennedy said he did not remember. Then, the prosecutor asked the witness if he recalled talking to him and a district attorney investigator during the previous week and telling them that he heard appellant tell Pearl Hardy, "I just shot one nigger three times and I will kill you and all your men." Kennedy did not remember the conversation.

It is the rule of this state that the credibility of a witness may be attacked by any party, including the party calling him, by proof that the witness made an extrajudicial statement inconsistent with any part of his testimony at the trial (Evid. Code, §§ 780, subd. (h), 785). The case of *People* v. *Johnson, supra,* 68 Cal.2d 646, does not impinge on this method of impeachment (*People* v. *Alvarez,* 268 Cal.App.2d 297 [73 Cal.Rptr. 753]). While the court held in *Johnson* that the use of a witness' prior inconsistent statements as substantive evidence interferes with a defendant's Sixth Amendment right of confrontation, the court was careful to point out that such extrajudicial statements are admissible for impeachment purposes. Consequently, while we are inclined to agree with appellant's assertion that the prosecutor attempted to impeach the witness Bell by showing that he made an inconsistent statement, we do not agree with appellant's suggestion that the inconsistent statement was inadmissible for impeachment purposes.

The case of *Douglas* v. *State of Alabama,* 380 U.S. 415, 419 [13 L.Ed.2d 934, 937-938, 85 S.Ct. 1074], upon which appellant relies, is distinguishable. In that case, the witness was defendant's accomplice, and he refused to testify on the ground that his testimony would tend to incriminate him. Then, the prosecutor, under the guise of cross-examination to refresh the witness' recollection, read statements allegedly made by the witness which incriminated the defendant. Because the witness had not testified, his extrajudicial statements could not be used for impeachment ·purposes, and it was evident that the prosecutor was merely trying to get the statements ·before the jury. Understandably, the United States Supreme Court stated:' "Although the Solicitor's reading of Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, the Solicitor's reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statment; . . ."

Appellant also relies on *People* v. *Miller,* 211 Cal.App.2d 569, 576 [27 Cal.Rptr. 290], and charges the prosecutor with misconduct for

his failure to offer any evidence to prove that the inconsistent statement was actually made by Kennedy. The court in that case stated: "It is improper for a prosecuting attorney to pursue a line of questioning which will insinuate that certain facts exist or are believed by the prosecuting attorney to exist, when they are not susceptible of proof. [Citation]. In order to avoid a charge of misconduct, the prosecutor must be prepared to follow up with some evidence questions which clearly suggest the existence of facts harmful to defendant, if their existence should be denied."

We have no quarrel with the quoted language of *People* v. *Miller, supra.* **(5)** We merely note that the term "misconduct" implies a dishonest act or an attempt to persuade the court and jury by the use of deceptive or reprehensible methods *(People* v. *Baker,* 207 Cal.App.2d 717 [24 Cal.Rptr. 691]). ██ We do not believe that the prosecutor intended to deceive the jury in this case. In fact, our perusal of the record leads us to believe that his failure to offer any evidence to prove that Kennedy actually made the inconsistent statement to which he (the prosecutor) had alluded was due to inexperience. Any improper suggestion which may have arisen from the prosecutor's question was overcome by Pearl Hardy's direct testimony to the same effect.

Defendant asks us to strike the "armed clause" from the abstract of judgment; the abstract states that he was armed with a deadly weapon under Penal Code section 3024. He equates an assault with the intent to commit murder with an assault with a deadly weapon, because while both offenses are normally committed with deadly weapons of the kind mentioned in section 3024, each offense can be committed with some other dangerous weapon, and argues that the provisions of this section and section 12022 are inapplicable under the rationale of *In re Shull,* 23 Cal.2d 745 [146 P.2d 417]. Section 3024 inter alia fixes a minimum prison term for any person who commits a felony while armed with a deadly weapon as defined in the section. Section 12022 provides for an additional sentence for any person who commits or attempts to commit a felony while armed with any of the weapons mentioned in section 3024.

Defendant misconstrues *In re Shull, supra,* 23 Cal.2d 745, 751. ██ The obvious legislative purpose behind sections 3024 and 12022 is to discourage the use of guns and similar deadly weapons in the commission of crimes to minimize the risk of death or serious physical injury to the victim; an armed felon is far more dangerous than an unarmed one. By judicial fiat, the sections are not applicable to crimes for which the use or possession of a deadly weapon is one of the essential elements *(People* v. *Floyd,* 71 Cal.2d 879 [80 Cal.Rptr. 22, 457 P.2d 862]). As the Supreme Court stated in *In re Shull, supra,* with reference to the application of the

increased punishment provision (now found in § 12022), to the crime of assault with a deadly weapon, "the Legislature has fixed the punishment for an assault where a deadly weapon is used, a particular crime, and it is not to be supposed that for the same offense, without any additional factor existing the added punishment should be imposed."[3] ■ But, the use of a gun or some other deadly weapon is not generic to an assault with an intent to commit murder nor is it the basis for the punishment fixed by the Legislature for that particular crime. An assault with intent to commit murder can be accomplished without the use of any weapon, as, for example, if A pushes B off a cliff with the intent to kill him; the use of a gun or similar weapon is merely one of the means by which the crime can be committed. ■ Consequently, sections 3024 and 12022 are applicable to an assault with an intent to commit murder even though the crime is normally committed with a gun or similar deadly weapon.

We also do not agree with the Attorney General's assumption that section 12022 was not applied in this case because the words "not applicable" were inserted in that part of the abstract of judgment which speaks of consecutive sentences. The abstract is in the standard printed form, and we believe that the trial judge inserted the words "not applicable" because he was not sentencing on separate offenses. In other words, section 12022 states that "[s]uch additional period of imprisonment shall commence upon the expiration or other termination of the sentence imposed for the crime of which defendant is convicted. ■ Thus, because the court sentenced defendant to state prison for the term prescribed by law, for the crime of which he was convicted, and because the abstract of judgment recites that he was armed with deadly weapon under section 3024, the provisions of section 12022 are automatically applicable, and the additional sentence will be imposed by the Adult Authority.

The judgment is affirmed.

Stone, P. J., and Coakley, J., concurred.

A petition for a rehearing was denied May 6, 1970, and appellant's petition for a hearing by the Supreme Court was denied June 5, 1970.

---

[3]If A commits an assault on B with a weapon which does not qualify as a deadly weapon under sections 3024 and 12022, while A also is armed with a pistol or revolver, the sections would be applicable because A's possession of the pistol was not an essential element to the commission of the crime since he did not use it, and it would constitute the additional factor referred to in *In re Shull,* 23 Cal.2d 745 [146 P.2d 417].